Pasquale ANTONIELLO, Plaintiff,

v.

Julius MICHAEL and Morris Mishkin, d/b/a Bond Industrial Maintenance, Defendants (The United States of America, Defendant and Third-Party Plaintiff, Pittston Stevedoring Corporation, Third-Party Defendant).

Civ. A. No. 11911.

United States District Court
E. D. New York.

May 17, 1957.

Murray Rosen, Brooklyn, N. Y., for plaintiff.

James Doherty, New York City, for defendant, Bond Industrial Maintenance.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., for United States, by Joseph Soviero, Asst. U. S. Atty., Jamaica, N. Y.

William J. Kenney, New York City, for defendant Pittston Stevedoring Corp., by Joseph Feury, New York City, of counsel.

RAYFIEL, District Judge.

This is an action to recover damages for personal injuries sustained by the plaintiff on November 24, 1950, at Pier 2, New York Port of Embarkation, Brooklyn, New York, owned and operated by the United States. The action was brought under the Federal Tort Claims Act, Section 1346, Title 28, U. S. Code. The plaintiff joined Julius Michael and Morris Mishkin, doing business as Bond Industrial Maintenance Co., as defendants, but discontinued the action as against them during the trial. The United States impleaded Pittston Steve-

doring Corporation, hereinafter called Pittston, claiming that the contract between them contained a covenant whereby Pittston agreed to indemnify the United States against claims such as that herein asserted.

The facts are as follows: Pittston had a contract with the United States under which it was to perform stevedoring work on the piers of the New York Port of Embarkation. The plaintiff was employed by Pittston as an operator of a so-called hi-lo fork lift, a self-propelled vehicle used to move cargo from place to place on the pier. The front of the vehicle contained a boom to which were attached two fork-like devices which could be raised or lowered through the manipulation by the operator of certain levers. When the vehicle was in use, these forks were inserted into wooden pallets or platforms on which cargo had been loaded, and the pallets and cargo, resting on the fork, would then be transported to other places on the pier where needed.

On the day of the accident the plaintiff was operating a hi-lo fork lift on Pier 2. His vehicle, inclusive of the forks, was approximately fourteen feet in length and eight feet in height. The seat occupied by the plaintiff was about four feet from the ground and four or five feet from the rear thereof, with the steering wheel in front of him.

Pier 2 has a lower and an upper level. Cargo is brought from one level to the other by means of freight elevators, designated by numbers. The plaintiff was working on the lower level. Immediately prior to the accident he was engaged in transporting pallets loaded with cartons of cigarettes into elevator number 1 from a point about fifteen or twenty feet therefrom, so that they might be carried to the upper level.

The operation of elevator number 1 was controlled by two sets of buttons. One set regulated the opening and closing of the elevator door, which operated vertically, and the other controlled the raising and lowering of the elevator. These sets of buttons were located on the wall outside the elevator, on the left side as one faced the rear thereof. There were duplicate sets of buttons inside the elevator, which permitted control of the elevator and door from the inside.

The elevator, which was nine feet high, sixteen feet long, and nine feet wide, could hold three pallets of the size which the plaintiff was moving immediately prior to the accident. At about 4 P.M., on November 24, 1950, the plaintiff brought a pallet loaded with cartons of cigarettes into the elevator, which was then empty, set it on the floor in the rear thereof, and proceeded to back out of the elevator in order to obtain another. When he was about halfway out of the elevator, the elevator door fell upon him, pinning him to the wheel. By manipulating a lever on his vehicle which permitted it to move forward, he was able to free himself from the door before losing consciousness. His fellow employees then removed him from the elevator to an ambulance which had arrived at the scene, and he was taken to Shore Road Hospital.

The testimony disclosed that one Giacomo Rutigliano, a fellow employee of the plaintiff, operated elevator number 1 on the day of the accident. The plaintiff testified that as he was backing his vehicle out of the elevator, immediately prior to the accident, he glanced back and saw Rutigliano standing about fifteen or twenty feet away from it. Benasillo, also an employee of Pittston, testifying in behalf of the plaintiff, stated that Rutigliano was from ten to fifteen feet away from the buttons on the outside of the elevator when the door came down and struck the plaintiff. Both the plaintiff and Benasillo were cross examined at great length by the Government's counsel as to allegedly contradictory statements which they had previously made. The plaintiff was questioned concerning his testimony at an examination before trial, wherein he stated that he "was not interested in the elevator man" while he was backing his vehicle out of the elevator and could not say where he was at the time. Benasillo was

. . . .

questioned about a statement which he allegedly had made, the original of which was not produced by the Government. Unfortunately, Rutigliano was ill and confined to a hospital at the time of the trial, and could not appear as a witness.

The plaintiff and Benasillo, as well as one Sparacio, Pittston's foreman in charge of Pier 2, all testified as to various occasions when the door at elevator number 1, as well as the elevator itself, had failed to function properly. The plaintiff testified as to two such incidents, one about three months prior to the accident herein involved, and another about a month prior thereto, in which the elevator door had dropped, although the control buttons had not been pressed. He testified that he reported the latter incident to one Captain Richards, the Government officer in charge of the pier, and reported the earlier one to his foreman, Sparacio. The others hereinabove named testified to similar incidents. They, too, stated that they informed Captain Richards of those occurrences. Government work orders, received as the Court's Exhibit 1, reveal that repairs were made to the door in question on six separate occasions between October 4, 1950 and November 20, 1950. In fact, door and counterweight ropes on both upper and lower levels were replaced on October 6, October 13 and October 20, 1950. Captain Richards was not called as a witness.

Witnesses for the United States testified as to the functioning of the elevator and door in question. They stated that an inspection of the elevator and door, made on the morning of the accident, disclosed no defect or malfunctioning of either. They also testified that immediately after the accident another inspection was made, which disclosed no defect in the door, elevator, or the machinery and equipment which operated them.

The plaintiff contends that the United States owned, maintained and controlled the instrumentality in question, viz., the elevator and door, and hence, the accident having occurred in the manner claimed by the plaintiff, the doctrine of res ipsa loquitur applies, and a presumption of negligence is imputed to the United States, upon whom is cast the burden of coming forward with an explanation of the occurrence.

The defendant, United States of America, on the other hand, argues that although it owned, maintained and controlled the elevator and door, Pittston, the plaintiff's employer, was under obligation to operate them, and, in fact, Rutigliano, its employee, was designated as the operator of elevator number 1. Hence, the Government contends, it was not in *exclusive* control of the elevator and door. It cites numerous cases in support of its contention, including the case of Courtney v. Gainsborough Studios, 186 App.Div. 820, 174 N.Y.S. 855, in which an elevator was involved, in which the Appellate Division reversed a judgment based upon the doctrine of res ipsa loquitur. In that case, however, the facts differed from those in the instant case, for the court said, 174 N.Y.S. at page 860, "Where it appears, as I think it does in this case, that the accident might have happened from causes for which defendant was not responsible, the presumption of negligence is destroyed; and the doctrine of res ipsa loquitur has no application. *Not only does the evidence in this case show that the accident might have occurred from causes other than defendant's negligence, but it points quite irresistibly to the conclusion that the carelessness of plaintiff or his helper, Murphy, caused the car to start.* The res is not alone the accident, but includes all attendant circumstances, and therefrom it appears that the accident might have occurred from causes for which defendant was in no wise responsible."

In the case at bar, ownership, maintenance and exclusive control was in the Government. There was evidence of prior occurrences of a similar nature which were reported to Captain Richards. There was no denial thereof. The Government's own records show repeated repairs to the elevator and door in-

volved in the case, necessitated, undoubtedly, by the malfunctioning thereof. It is the Government's theory that someone, perhaps Rutigliano, the elevator operator, pressed the control buttons on the outside of the elevator, causing the door to descend and strike the plaintiff, as he was driving his fork lift out of the elevator. I reject this theory, especially since it is undisputed that the plaintiff had brought only the *first* of the three pallets into the elevator prior to the accident, which occurred as he was backing out of the elevator in order to get the second pallet and, ultimately, the third, in order to complete the load. The plaintiff's testimony was that there was *no one* in the elevator with him, that neither he nor his vehicle could have pressed the buttons in the elevator accidentally. Even if Rutigliano was only *one* or *two* feet from the buttons on the outside, as Benasillo, aforementioned, was reported to have stated, instead of fifteen or twenty feet away, I cannot believe that he would have pressed the control buttons when it must have been obvious to him that after the plaintiff had delivered the first pallet he would have had to leave the elevator in order to complete the loading operation. In addition, there was testimony, undisputed, that after three pallets had been loaded in the elevator, Rutigliano would enter the elevator, check the loading thereof, and *then* deliver them to the upper level.

I find, therefore, that the accident to the plaintiff was caused solely by the negligence of the United States of America, the plaintiff being free from contributory negligence. Hence, the cross-complaint of the United States of America against Pittston is dismissed, since the agreement between them provides that the United States of America would be liable "If the damage, injury, or death resulted solely from an act or omission of the Government or its employees".

As a result of the accident the plaintiff suffered the following injuries:

Laceration of the scalp, about five inches long, running from the forehead to the top of the head, requiring about sixty sutures; multiple ragged lacerations of the left cheek, eyebrow, and chin, and swelling and ecchymosis of left eye. He also suffered a laceration of the mouth, fracture of the left cheek bone, and multiple abrasions, swelling and tenderness over scapular area.

He claimed that at the time of the trial he was suffering from pain in his lower back due to a low-back derangement and bursitis. There were various scars on his face caused by the accident, and he complained of numbness in the left side of his face and a feeling of "pins and needles" when his face was stroked, as in shaving. However, there was no serious cosmetic disfigurement noticeable at the time of the trial.

After the accident he was hospitalized for eighteen days. He was unable to work for six months thereafter, resulting in a loss of earnings of approximately $1,500. He claimed a further partial loss of earnings of $1,000, but failed to offer figures to substantiate the same. His medical, hospital and doctor's bills amounted to $805.54. His special damages, therefore, aggregate $2,305.54. I find that, aside from the scars on his face and the claimed numbness, he suffered no permanent injuries as a result of the accident, and will suffer no further loss of earnings. By reason of the foregoing and for his pain and suffering, I direct that judgment be entered in favor of the plaintiff against the defendant, United States of America in the sum of $10,000.

Submit findings of fact and conclusions of law in conformity herewith.